**Jawed MANJLAI, Appellant**

v.

**Nabila Hamid MANJLAI, Appellee.**

**No. 14–13–00463–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 26, 2014.

Rehearing En Banc Overruled
Sept. 30, 2014.

Jeffrey D. Rago, Rago Law Office, El Paso, TX, for Appellant.

William F. Harmeyer, William F. Harmeyer & Associates, Houston, TX, for Appellee.

Panel consists of Chief Justice FROST and Justices JAMISON and WISE.

## MAJORITY OPINION

KEN WISE, Justice.

Following a jury trial, the trial court awarded Nabila Hamid Manjlai an annulment of her marriage to Jawed Manjlai. In this appeal, Jawed Manjlai contends the trial court's denials of his motions for judgment notwithstanding the verdict ("JNOV") and for new trial were improper because the evidence is legally and factually insufficient to support the jury's findings. We affirm.

### BACKGROUND

Nabila is a citizen of the United States living in Houston, Texas. Jawed was born in Pakistan and came to the United States on a visitor's visa in October 2006. Nabila and Jawed were introduced to each other by a marriage broker retained by Jawed and his family. The two met in Houston in November 2007, and with the agreement of both families, were engaged in January 2008. Nabila agreed to sponsor Jawed for

permanent United States residency (a "green card") after their marriage.

Nabila and Jawed were married by civil proceedings in Texas on February 1, 2008. Nabila filed a green card application for Jawed on February 6, 2008. In accordance with their faith, the parties married in the Islamic tradition on March 20, 2008. In February 2011, Jawed's green card application was approved. In July 2011, Nabila learned from others in her community that Jawed had terminated their marriage through a ceremony according to Islamic tradition.

Nabila filed this action in Harris County District Court in July 2011, seeking an annulment of her civil marriage to Jawed on the grounds that Jawed used fraud to induce her into the marriage. At trial, Nabila presented evidence to show that Jawed entered into the marriage solely as part of a scheme to obtain a green card for himself and to induce Nabila's family to provide various material benefits to himself and his family.

Testimony showed that Jawed and his family were in the United States illegally at the time they retained the marriage broker. Nabila testified that Jawed's family campaigned for a civil marriage immediately after the engagement, followed by filing a green card application. Jawed's family requested a six- to nine-month delay for the religious marriage, which Nabila's family rejected. After their religious marriage, Nabila moved with Jawed across the country to Boston, then to Atlanta. Nabila testified that Jawed's parents moved in with them into their one-bedroom apartment in Boston shortly after the move.

Nabila testified that, during this time, Jawed never showed her any expressions of love. Furthermore, Nabila testified that Jawed never bought her flowers or presents. Nabila explained that it felt like they "were just roommates," and that Jawed's family would frequently whisper in other parts of the apartment where she was not able to hear. Due to frequent fighting and arguments between Nabila and Jawed's mother, Nabila expressed her desire to move back to Houston with her family. Shortly after Nabila filed a portion of Jawed's green card application that required proof of their residence together, Jawed bought Nabila a ticket to return to Houston alone.

The evidence also showed several episodes in which Nabila's family loaned money to Jawed's family that was never repaid, as well as jewelry that was never returned. Nabila and her father, Abdul Zakaria, testified that, according to Pakistani tradition, the Zakaria family advanced a $20,000 loan to the Manjlai family to pay for their portion of the wedding costs. Shortly after the civil wedding ceremony, Jawed was detained by Immigration and Customs Enforcement officials. Abdul testified that the Zakaria family loaned $16,500 to the Manjlai family for attorney's fees, a bond deposit, and filing fees on Jawed's behalf with the expectation and assurance that these sums would be repaid. As part of the Islamic wedding ceremony, the Zakarias entrusted Jawed's mother with over $25,000 in gold jewelry that belonged to Nabila. At the time of trial, none of the above amounts had been repaid and none of the jewelry had been returned to Nabila or the Zakaria family.

Evidence at trial showed that Nabila had applied for a student loan from Chase Bank about sixth months after the marriage, but Jawed later told Nabila she had been denied the loan. Nabila testified that she subsequently learned the loan had been approved for $2,500, although Jawed had cashed the check without telling her.

After Jawed's green card application was approved in February 2011, he traveled from Atlanta to Houston to retrieve the card from Nabila and her family. While Jawed was in Houston, Abdul Zakaria directed him to bring back or replace Nabila's gold, to repay money that was loaned to the Manjlai family, to ensure his parents moved home to Pakistan, and to be a better person. Similarly, Nabila asked Jawed to sign a hand-written contract stating that, among other things, Jawed would never lie to Nabila and would never apply for a green card for his family members. Nabila threatened to leave the marriage if Jawed did not comply with this new set of promises. Jawed signed the document on July 5, 2011. Nabila testified that Jawed avoided picking up her calls for the next five days. Text message conversations in the record reflect that Jawed repeatedly assured Nabila that he would meet Abdul Zakaria's demands.

Nabila testified that Jawed texted her on July 10, 2011, stating "it's all over." Three days after the text, Nabila learned through a community member that Jawed had divorced her according to Islamic tradition. Nabila testified that her reputation was damaged in her community when Jawed divorced her. Furthermore, Nabila testified that she first realized the marriage was a fraud when Jawed divorced her without explanation.

Finally, testimony revealed that Jawed had discussed marriage and a subsequent green card application with another woman, Anam Syed, shortly before he agreed to marry Nabila. Syed testified that she met Jawed through an online dating website, and had informally agreed to marry him before his engagement to Nabila. Additionally, Syed testified that Jawed understood she was an American citizen, and that the two spoke "in detail" about the possibilities of Syed petitioning for Jawed's green card. Testimony at trial showed that neither Jawed nor his family disclosed to Nabila that Jawed was informally engaged to Syed.

At the end of the trial, the jury reached a verdict determining Jawed had used fraud to induce Nabila into the marriage and that Nabila had stopped cohabitating with Jawed after discovering the fraud. Jawed's motions for a JNOV and for a new trial were denied. This appeal followed.

## ISSUES AND ANALYSIS

Jawed contends that the evidence is legally and factually insufficient to support the trial court's denial of his motion for JNOV and motion for new trial. Because Jawed has not preserved error as to his factual sufficiency argument, we address only his legal sufficiency argument.

### I. Standard of Review and Applicable Law

The trial court's denial of a motion for JNOV is reviewed under a legal sufficiency standard. *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). When reviewing a trial court's ruling on a motion for new trial, we generally apply the abuse-of-discretion standard. *Memon v. Shaikh*, 401 S.W.3d 407, 416 (Tex.App.-Houston [14th Dist.] 2013, no pet.). But if, as in this case, the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, then we review the trial court's denial of the motion by applying the standard of review that corresponds to the sufficiency challenge. *Id.* A complaint of factual insufficiency of the evidence to support a jury finding must have been raised in a motion for new trial. *See* Tex.R. Civ. P. 324(b)(2) and (3); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex.1991). Here, Jawed's motion for new trial alleges only that there is no evidence to support

the jury's verdict; it does not raise any issue regarding the factual sufficiency of the evidence. Therefore, Jawed has failed to preserve his factual sufficiency issue and we do not address it.

■ The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* Because jurors are the sole judges of the credibility of witnesses and may choose to believe one witness and disbelieve another, we must not substitute our opinion for that of the jury. *See id.* at 819. It is the role of the jury to resolve conflicts in the evidence; accordingly, we must review the evidence in a light favorable to the verdict and assume that jurors resolved all conflicts in accordance with that verdict. *Id.* at 820.

■ Fraudulent inducement is established by proving that a false material representation was made that was known to be false when it was made, was intended to be acted upon, was relied upon, and caused injury. *Leax v. Leax*, 305 S.W.3d 22, 29 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). A promise of future performance is actionable as a false representation if the promise was made with no intention of performing at the time it was made. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam) (citations omitted). While breach of a contract alone is not evidence that a party did not intend to perform, breach combined with slight circumstantial evidence of fraud is enough

evidence to support a verdict for fraud. *Id.* at 775. A party's intent is determined at the time the party made the representation, but it may be inferred from the party's subsequent acts after the representation is made. *Id.*

**II. Analysis**

■ At the conclusion of trial, the jury found that Nabila used fraud to induce Nabila into the marriage and that Nabila did not voluntarily cohabitate with Jawed after realizing the fraud. Pursuant to section 6.107 of the Texas Family Code, the trial court entered a judgment granting Nabila an annulment of the marriage. Section 6.107, entitled "Fraud, Duress, or Force," provides:

> The court may grant an annulment of a marriage to a party to the marriage if:
>
> (1) the other party used fraud, duress, or force to induce the petitioner to enter into the marriage; and
>
> (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud or since being released from the duress or force.

Tex. Fam.Code § 6.107.

Jawed first asserts that there is no evidence to support the jury's verdict because: (1) all of the alleged false representations occurred during the marriage, not before, and therefore cannot support a claim for inducement; and (2) the evidence established that Nabila continued cohabitating with Jawed after discovering the alleged fraud. Furthermore, Jawed contends that all previous Texas cases in which annulments were granted are "based on some objective facts," and this case presents no such objective facts.

Our review of the record reveals legally sufficient evidence from which a reasonable juror could infer that Jawed used fraud to induce Nabila into marriage.

Even though Jawed contends that any false representations were made during, rather than before, the marriage, the record reveals circumstantial evidence from which a jury could infer that Jawed made false representations intended to induce Nabila into executing the civil ceremony. See Aquaplex, 297 S.W.3d at 775 ("While breach of the contract alone is not evidence that a party did not intend to perform, 'breach combined with slight circumstantial evidence of fraud' is some evidence of fraudulent intent, enough to support a verdict."). Jawed's insistence on a green card application, his refusal to pay back various loans, and his informal engagement with another woman with whom he discussed obtaining a green card immediately before his engagement to Nabila all support the conclusion that Jawed only intended to marry Nabila for reasons other than fulfilling his marital vows. This conclusion is also supported by Jawed divorcing Nabila by Islamic tradition soon after he obtained his green card. Thus, the jury reasonably could infer that Jawed's marriage vows, i.e., promises to remain married for life, were false representations at the time he made them. Similarly, the jury reasonably could infer that Jawed made representations that were intended to be acted upon, were known to be false when he made them, and caused injury to Nabila in the form of grief and lost reputation.

Jawed further contends that the evidence established that Nabila continued to cohabitate with Jawed after discovering the alleged fraud and, therefore, the evidence is insufficient to support the jury's verdict. On cross-examination, opposing counsel asked Nabila if she continued living with Jawed after she discovered that Jawed "lies and hides things," which she alleged was a fraud. Nabila answered affirmatively. Furthermore, Nabila answered affirmatively that she "discovered what [she calls a] fraud but [she] chose to continue living as a wife with [Jawed.]" She later clarified her position, though, stating that she "didn't know at the time" about the "green card fraud," and that she only realized Jawed married her for a green card when Jawed divorced her by the Islamic tradition. Nabila's clarification was consistent with her testimony on direct-examination, when she testified that she realized her husband married her only for the green card "when I found out he divorced me."

Although Jawed contends that Nabila's testimony conclusively established that she voluntarily cohabitated with him after discovering the fraud, Nabila's later testimony conflicts with that conclusion. Viewing the evidence in a light favorable to the verdict, we must assume that the jurors resolved all conflicts in accordance with the verdict. City of Keller, 168 S.W.3d at 820. Here, the jury could resolve any conflicts in her testimony by determining that Nabila discovered many of Jawed's lies during the marriage, yet she was never aware of the entire fraud regarding the green card until after Jawed divorced her. By the time Jawed divorced Nabila, the couple was not cohabitating. Thus, the evidence is sufficient to support the jury's conclusion that Nabila did not cohabitate with Jawed after discovering the fraud.

Finally, Jawed asserts that we should reverse the trial court's decisions because Nabila threatened to leave the marriage if Jawed did not sign an agreement stating that, among other things, Jawed would not lie to Nabila nor apply for a green card for any of his family members. Jawed contends that, "there is no Texas law ... where the party threatening divorce and making written demands upon the other party has ever successfully been granted an annulment." Nowhere in Jawed's appellate brief does he explain why the

agreement he signed with Nabila should render the evidence legally insufficient, and we do not determine this fact is controlling. The fact that Nabila attempted to repair the marriage by demanding that Jawed change his behavior has no bearing on whether Jawed made false representations intended to induce Nabila into the marriage in the first place.

Given the circumstantial evidence tending to show Jawed's intent not to perform his obligations under his marital vows and Nabila's testimony that she did not discover the fraud until after she and Jawed had separated, we determine legally sufficient evidence exists to support the jury's findings. *See Aquaplex*, 297 S.W.3d at 775.

We overrule Jawed's issues and affirm the trial court's denial of his motions for JNOV and new trial.

C.J. FROST, dissenting.

KEM THOMPSON FROST, Chief Justice, dissenting opinion.

Both an annulment and a divorce dissolve a marriage, but differences between the two procedures potentially impact the spouses' rights in significant and lasting ways. A divorce does not make the marriage void ab initio; an annulment might make the marriage so and arguably might affect the ability of one of the spouses to maintain status as a permanent resident of the United States of America if that status was obtained based on the marriage that was later annulled. The Texas Legislature has provided for divorce under various scenarios arising after the parties' marriage and also for annulment under very narrow sets of circumstances arising before or at the time of the parties' marriage. The two legal remedies are not interchangeable. Using one in place of the other creates precedent contrary to the statute's unambiguous language. Because the trial evidence in today's case is legally

insufficient to support the jury's findings in support of the annulment basis asserted, divorce, rather than annulment, is the proper outcome.

A wife who ceremonially married her husband in Texas filed suit seeking to annul their three-year marriage based on an allegation that the husband fraudulently induced her to marry him. As an alternative ground for dissolution of the marriage, the wife sought a divorce. The trial court granted an annulment based on jury findings. On appeal, the issue is whether the trial evidence is legally sufficient to support the jury's findings that the husband induced the wife to marry him by a materially false representation or promise and that the wife did not voluntarily cohabitate with the husband after realizing the alleged fraud. Because the evidence is legally insufficient to support the jury's findings, this court should reverse the trial court's judgment annulling the marriage and remand to the trial court for rendition of a divorce decree.

### Appellate Issues

Appellee/plaintiff Nabila Hamid Manjlai and her parents sued her husband appellant/defendant Jawed Manjlai, his parents, and his brother. Nabila sought an annulment of her marriage to Jawed under Texas Family Code section 6.107, on the basis that Jawed fraudulently induced her to marry him, and in the alternative, she asked for a divorce. Nabila and her parents also sought money damages based upon claims for common-law fraud, conversion, and a claim under the Texas Theft Liability Act.

Following a jury trial, the trial court submitted jury questions dealing with Nabila's entitlement to an annulment. The jury answered the questions favorably to Nabila, and the trial court rendered judg-

ment on the verdict annulling the marriage. Nabila's parents recovered money judgments against Jawed's father and brother and against Jawed.[1]

In the trial court Jawed filed a motion for judgment notwithstanding the verdict challenging the legal sufficiency of the evidence supporting the jury's answers to the two questions submitted. The trial court denied the motion. On appeal, Jawed asserts that the trial evidence is legally and factually insufficient to support the jury's answers to these questions and asks this court to reverse the trial court's annulment of the marriage.

## Standard of Review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it.[2] We must credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not.[3] We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue.[4] The jury is the only judge of witness credibility and the weight to give to testimony.[5]

## The Potential Significance of the Distinction Between Annulment and Divorce

The Texas Legislature has established three statutory means by which a marriage may be dissolved in Texas: (1) a suit for divorce, (2) a suit for annulment, and (3) a suit to declare a marriage void.[6] Under the Family Code, divorce is available under various circumstances arising after the parties' marriage.[7] By contrast, annulment is available only in limited circumstances arising before or at the time of the parties' marriage.[8]

Divorce dissolves the marriage but does not make it void ab initio—meaning void from its inception, as if it never happened.[9] Cases decided before the Legislature enacted the Family Code suggest that annulment makes the marriage void ab initio, at least as between the parties to the marriage.[10] The current version of the Family

---

1. Jawed is the only party who has appealed. No party has challenged these money judgments. Thus, even if this court were to reverse the trial court's annulment of the marriage, these money judgments would be severed and affirmed.

2. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005).

3. *See id.* at 827.

4. *See id.*

5. *See id.* at 819.

6. *See* Tex. Family Code Ann. § 1.003 (West 2014).

7. *See* Tex. Family Code Ann. § 6.001, *et seq.* (West 2014).

8. *See* Tex. Family Code Ann. § 6.102, *et seq.* (West 2014). In addition, under the Family Code various types of marriages are void based upon the status of one or both of the parties to the purported marriage. *See* Tex. Family Code Ann. § 6.201, *et seq.* (West 2014).

9. *See Garcia v. Garcia*, 232 S.W.2d 782, 783 (Tex.Civ.App.-San Antonio 1950, no writ).

10. *See Home of Holy Infancy v. Kaska*, 397 S.W.2d 208, 212–13 (Tex.1965) (stating that "[w]e generally think of an annulment as placing the parties in the same position as if they had never married" and that "[t]he annulment decree may relate back to the time of the marriage as between the parties to the former suit, but it will not be given that effect in determining the legitimacy of their child"); *Garcia*, 232 S.W.2d at 783 (stating that "[a] suit for annulment presumes that there never was a valid marriage and that therefore it should be declared void").

Code does not state whether a marriage subject to annulment is voidable, void, or void ab initio.[11] The parties have not cited and research has not revealed any case under the Family Code that contains an unequivocal holding as to whether an annulled marriage is void ab initio between the parties or as to third parties.[12] The existence of a separate suit to declare a marriage void as well as several sections of the Family Code arguably might support the proposition that an annulled marriage is not void ab initio.[13] On the other hand, various cases support the proposition that an annulled marriage is void ab initio between the parties or as to third parties.[14]

At trial, Nabila testified that she was told that if she is granted an annulment of the marriage, there is a possibility that Jawed might lose his "green card," that reflects his permanent-resident status and allows him to remain in this country. Nabila stated that she sought an annulment because she wants Jawed to lose his green card. Nabila agreed that "the annulment is just window dressing maybe to get Jawed to lose his green card."

The issue of whether an annulled marriage is void ab initio between the parties or as to third parties is not before this court, nor is the issue of the effect, if any, of the trial court's 2013 annulment of the marriage on Jawed's immigration status. Nonetheless, whether the marriage is dissolved by annulment or divorce arguably might determine whether the marriage is void ab initio and whether Jawed may maintain his status as a permanent resident. Thus, it is important not to allow an annulment under circumstances in which a divorce is the proper remedy because doing so may wipe out valuable rights and create precedent that undercuts the statute's unambiguous language prescribing a narrow set of circumstances under which annulment is available.[15]

### The Jury Findings

Jawed asserts that the trial evidence is legally insufficient to support the jury's answer to the two questions submitted. In response to Question 1 the jury found that Jawed fraudulently induced Nabila into the marriage. The trial court instructed the jury that fraudulent inducement occurs when "a. a material false representation or promise has been made; and b. was known to be false when made; and c. was intended to be acted upon; and d. caused injury." Voluntary cohabitation after discovery of the fraud vitiates the grounds for an annulment under Texas Family Code section 6.107.[16] In response to Question 2 the jury found that Nabila did not voluntarily cohabitate with Jawed after realizing the fraud. These questions addressed Nabila's request that her marriage to Jawed be an-

11. See Tex. Family Code Ann. § 1.001, et seq. (West 2014).

12. Arguably, the court in *Fernandez v. Fernandez* may have held that the annulled marriage was void ab initio, but it did not expressly say so. See 717 S.W.2d 781, 782–83 (Tex.App.-El Paso 1986, writ dism'd).

13. See Tex. Family Code Ann. §§ 1.003, 3.002, 7.002, 7.007 (West 2014).

14. See *Home of Holy Infancy*, 397 S.W.2d at 212–13; *Fernandez*, 717 S.W.2d at 782–83;

*Bruni v. State*, 669 S.W.2d 829, 834–35 (Tex. App.-Austin 1984, no writ); *Garcia*, 232 S.W.2d at 783.

15. See Tex. Family Code Ann. § 6.001, et seq., § 6.102, et seq. (West 2014).

16. See Tex. Family Code Ann. § 6.107 (West 2014) (stating that "[t]he court may grant an annulment of a marriage to a party to the marriage if: (1) the other party used fraud … to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud …. '").

nulled under Texas Family Code section 6.107. At the charge conference, no party objected to the form of these two questions; therefore, this court measures the sufficiency of the evidence using the language of this question and the instructions associated with it, even if they do not correctly state the law.[17]

Under the jury charge, fraudulent inducement in Question 1 had to be based either on a material, false promise that Jawed made to induce Nabila to marry him or on a material, false representation that Jawed made to induce Nabila to marry him. The evidence is insufficient to support either ground.

### Insufficiency of Evidence to Support a Finding of a Material, False Promise made to Induce Marriage

Nabila testified at trial as follows:

- Nabila married Jawed when she was twenty-one years old.
- It was an arranged marriage.
- She had not dated any others before she married Jawed.
- Nabila trusted her parents' judgment, but she was the one who ultimately decided to marry Jawed.
- Nabila understood before the marriage that Jawed did not have a green card.
- Nabila met Jawed in the middle of November 2007, and she thought that the marriage might work. Nabila's family and Jawed's family communicated throughout the following month.
- During the first week of January 2008, Nabila's family and Jawed's family agreed on the relationship, and Nabila and Jawed started planning their engagement. They had an engagement shower and an engagement party that month.
- There was a push from Jawed's family to get married in a civil ceremony so that Jawed could apply for a green card.
- Jawed and Nabila were civilly married on February 1, 2008, in a ceremony conducted by a judge at a courthouse in Harris County, Texas (the "Civil Ceremony").
- Jawed and his parents wanted the civil ceremony to be first and then the religious ceremony to be six to nine months later so that the green-card process could move forward. Nabila and her parents did not agree to that because, in their culture, the married couple does not cohabitate until after the religious marriage ceremony. It was agreed that the religious marriage ceremony would be in March 2008.
- Jawed and Nabila were married in an Islamic wedding ceremony on March 19, 2008 (the "Religious Ceremony"). After that ceremony, Nabila moved into an apartment and lived with Jawed and his family.

Nabila testified that she believes the sole reason Jawed married her was to obtain a green card. But, even if the evidence is sufficient to support a finding that the sole reason Jawed married Nabila was to obtain a green card, this reason would not constitute either a material, false promise by Jawed or a material, false representation by Jawed. Nabila argues that Jawed made a materially false promise in his wedding vows because he intend-

---

**17.** *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (holding that appellate court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard).

ed to stay married to Nabila only until he obtained a permanent green card, at which time Jawed intended to divorce Nabila. Nabila testified regarding the vows made by Jawed at the Religious Ceremony. To the extent Nabila relies on these statements as being false promises by Jawed, as a matter of Texas law, these promises could not have induced Nabila to marry Jawed more than a month earlier in the Civil Ceremony. Similarly, to the extent Nabila relies upon the promises that Jawed made to Nabila's father in July 2011, and in the letter that Jawed signed that month, these promises were made more than three years after Jawed and Nabila were married in the Civil Ceremony. Thus, as a matter of law, these promises could not have induced Nabila to marry Jawed.

To the extent Nabila relies upon any statements Jawed made at the Civil Ceremony as constituting false promises, there was no evidence at trial as to what Jawed or Nabila said or promised at that ceremony. Texas law does not require any particular form of marriage ceremony.[18] Thus, the fact that Jawed and Nabila had a valid ceremonial marriage under Texas law on February 1, 2008, by itself, is not evidence that Jawed promised to be Nabila's husband until one of them died, or beyond his receipt of a permanent green card.[19] There was no evidence at trial as to any promises Jawed made at the Civil Ceremony.

Even presuming that Jawed promised to be Nabila's husband and to take her as his wife, such action was required for Jawed to validly obtain his permanent green card. Under the applicable standard of review, the trial evidence is legally insufficient to support a finding that Jawed did not act as Nabila's husband and accept Nabila as his wife from February 1, 2008 through July 10, 2011. There was ample evidence at trial that Nabila was acting as Jawed's wife during this period. Though there was evidence of unseemly and abusive behavior by Jawed during the marriage, as well as significant friction between Nabila and Jawed's parents, such conduct is not inconsistent with Jawed acting as Nabila's husband. The evidence reflects that the couple lived together during most of this period, shared sexual relations, and held themselves out as husband and wife.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would not enable reasonable and fair-minded people to find that Jawed made a material, false promise to induce Nabila to marry him.[20]

### Insufficiency of Evidence to Support a Finding of a Material, False Representation made to Induce Marriage

Nabila testified at trial as follows:

- Between the Civil Ceremony and the Religious Ceremony, Jawed was picked up by immigration authorities.

---

18. *See* Tex. Family Code Ann. § 2.203 (2014); *Coulter v. Melady*, 489 S.W.2d 156, 158 (Tex. Civ.App.-Texarkana 1972, writ ref'd n.r.e.) (stating that "The [Texas Family Code] prescribes no set form for a marriage ceremony or the procedure therein. The official conducting the ceremony is not required to elicit particular or specific information or answers from a party to the marriage, nor are participants required to speak or respond in a given way.").

19. *See* Tex. Family Code Ann. § 2.203; *Coulter*, 489 S.W.2d at 158.

20. *See City of Keller*, 168 S.W.3d at 823, 827.

- Nabila's father retained a law firm to assist Jawed in being released from custody. Jawed was released. Jawed promised to repay Nabila's father for the money expended in this regard but Jawed never did so.

- Nabila learned after the Civil Ceremony that Jawed was in the United States illegally when she met him in November 2007. At the time she met him she knew only that he did not have a green card. When he met Nabila, Jawed did not tell her that he was in the United States illegally.

- Jawed was a dentist in Pakistan and wanted to stay in the United States and build a career in dentistry. To do that, Nabila would have to help him, and she would have to sponsor him for a green card. This plan was discussed before the engagement and Nabila had no problem with it.

- When Nabila moved in with Jawed, she expected Jawed's family to go back to Pakistan, but they did not do so.

- Nabila lived with Jawed and his family for nine to ten months in a Pearland, Texas apartment. Nabila was not treated well. She was excluded from conversations that Jawed had with his family. Jawed hid things from Nabila and lied to her. Jawed took money from Nabila's bank account without her permission and without saying anything to her about it.

- Jawed never made any expression of love for Nabila throughout the entire relationship. When Nabila asked Jawed about it, he said, "I'm from Pakistan. I don't know about this stuff." To Nabila, it seemed like they were two roommates living together.

- Towards the end of 2008, Nabila and Jawed moved from Houston, first briefly to Iowa and then to Boston for about eighteen months. During this period Nabila and Jawed were living together without Jawed's parents. Jawed's parents moved back in with the couple in August 2010, after Jawed lost his job. When Jawed's parents moved back in, Nabila again was mistreated.

- Four months later Jawed and his parents decided to move to Atlanta. Nabila did not want to move, but Jawed forced her to do so. After about two weeks in Atlanta, Nabila returned to Houston to live with her parents. Jawed and his parents continued living in Atlanta.

- Nabila told Jawed that he was welcome to come to Houston and live with Nabila at her parents' home. Jawed moved to Houston in February 2011, when his permanent green card arrived in the mail in Houston. Jawed lived with Nabila at her parents' home for about four months after receiving the permanent green card.

- Jawed's parents moved to Houston in June 2011.

- Nabila's parents had purchased $20,000 to $28,000 worth of gold jewelry over the years. Following Pakistani tradition, Nabila's parents gave her this jewelry to take to her new home after she married. Nabila gave the jewelry to Jawed's mother for safekeeping and Nabila did not see any of the jewelry again until June 2011, despite asking Jawed's mother several times to see the jewelry. In June 2011, Jawed's mother told Nabila that most of Nabila's jewelry had been stolen in 2009.

Approximately $8,000 in gold jewelry eventually was returned to Nabila.

- At the end of June 2011, Nabila's father talked to Jawed and told Jawed that he should replace Nabila's jewelry, stop lying, be a better person, that the money Jawed's parents owed to Nabila's father should be repaid, and that Jawed's parents should move back to Pakistan. Jawed said that he would do these things. He was supposed to accomplish them by July 10, 2011. Jawed also signed a letter that Nabila wrote in which he promised to change his behavior. Jawed did not fulfill his promises to Nabila's father.

- On July 10, 2011, Jawed texted Nabila that "it's all over." At trial, Nabila had not heard from Jawed since. Two or three days after receiving the text message, Nabila found out from a member of the community that Jawed had divorced Nabila pursuant to Islamic law shortly after sending that text. In Nabila's culture, once a man divorces a woman under Islamic law, she can never return to him. It was then that Nabila realized that Jawed married her only for the green card.

- After they were married, Jawed suggested that Nabila apply for a student loan. After she applied, Jawed told her that she had been turned down. Nabila later learned that the loan had been approved, and that Jawed obtained the $2,500 loan proceeds without telling her and used the money for his own purposes.

The bank then pursued Nabila for payment of this debt.

- Nabila is seeking an annulment of the marriage because it is a fraud. Nabila stated that the marriage is a fraud because, though it was legal, "everything that happened in the marriage was not correct."

Nabila cited a litany of conduct that she contended constituted fraud that would support her request for annulment. Nabila asserted that Jawed committed fraud by (1) taking money from her bank account after the Civil Ceremony, (2) hiding various matters from Nabila after the Civil Ceremony, such as Jawed's receipt of $33,500 from an unknown source, (3) sending money to Jawed's parents even though he had not paid the debt to Nabila's father, (4) lying to her after the Civil Ceremony, (5) texting her on July 10, 2011, that the relationship was over five days after signing a letter promising to change his ways, and (6) borrowing money and not repaying it. Significantly, all of this conduct occurred after Jawed and Nabila were married in the Civil Ceremony. Thus, as a matter of law, this post-marriage conduct could not have induced Nabila to marry Jawed.[21]

Nabila asserted that Jawed committed fraud by failing to disclose before the Civil Ceremony his prior relationship with another woman, Anna Saed, and that he was in the United States illegally. But, the jury was not charged on fraudulent nondisclosure and these alleged nondisclosures are not misrepresentations.[22] Nabila alleges that Jawed committed fraud because he allegedly married her to obtain a green

21. Nabila also testified that she discovered Jawed's alleged fraud in lying to her and concealing matters from her but that she continued to live with Jawed as his wife and have sexual relations with him because she was a good wife and she wanted him to change.

22. *See Osterberg,* 12 S.W.3d at 55; *Flo Trend Sys., Inc. v. Allwaste, Inc.,* 948 S.W.2d 4, 10 (Tex.App.-Houston [14th Dist.] 1997, no writ).

card. But, even if he married Nabila with this motivation, this conduct was not a misrepresentation which induced Nabila to marry Jawed.[23]

Nabila testified several times that Jawed did not make any representations to her before marriage and that he did not promise that his parents would move back to Pakistan. Nonetheless, at one point during her trial testimony Nabila stated that Jawed told her that his parents would move back to Pakistan. Presuming for the sake of argument that this statement was made before the Civil Ceremony, under the applicable standard of review, the evidence is legally insufficient to support a finding that Nabila did not cohabitate with Jawed after realizing that Jawed's parents were not moving back to Pakistan.[24] The subsequent cohabitation vitiates any such fraud.

Considering the evidence in the light most favorable to the challenged finding, indulging every reasonable inference that would support it, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, the trial evidence would not enable reasonable and fair-minded people to find that Jawed made a material, false representation to induce Nabila to marry him.[25]

***Conclusion***

Under Texas law, there are a wide range of circumstances under which a divorce is available, but the circumstances under which a marriage may be annulled are far more limited. In this case, the evidence is legally insufficient to support the jury's findings regarding the annulment ground based on fraudulent inducement.[26] Though the record contains evidence that Jawed engaged in deceptive conduct after the parties were married, this post-marriage conduct does not entitle Nabila to an annulment of the marriage. This court should sustain Jawed's appellate issue as to his legal-insufficiency argument, sever and affirm the trial court's judgment as to the defendants other than Jawed, reverse the trial court's judgment as to Jawed, and remand with instructions to the trial court to render a divorce decree. Because the court does not do so, I respectfully dissent.

---

**23.** *See Osterberg,* 12 S.W.3d at 55; *Flo Trend Sys., Inc.,* 948 S.W.2d at 10.

**24.** *See City of Keller,* 168 S.W.3d at 823, 827. The result would be the same whether this statement is considered to be an alleged promise or an alleged misrepresentation.

**25.** *See City of Keller,* 168 S.W.3d at 823, 827. There are several court of appeals cases in which sister courts have held that the evidence is legally sufficient to support fact findings in support of annulment under Texas Family Code section 6.107, but the evidence in these cases was materially different from the evidence in the case under review. *See Desta v. Anyaoha,* 371 S.W.3d 596, 598–600 (Tex.App.-Dallas 2012, no pet.); *Montenegro v. Avila,* 365 S.W.3d 822, 823–28 (Tex.App.-El Paso 2012, no pet.); *Villarreal v. Villarreal,* No. 09–09–00319–CV, 2010 WL 2854250, at *4–5 (Tex.App.-Beaumont July 22, 2010, no pet.) (mem. op.); *Leax v. Leax,* 305 S.W.3d 22, 28–31 (Tex.App.-Houston [1st Dist.] 2009, pet. denied).

**26.** Because the evidence is legally insufficient, there is no need to address Jawed's assertion that the evidence is factually insufficient.